IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KENNETH BOLLING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. NO. 2:19-cv-244-RAH |
| | ) | [WO] |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND FINAL ORDER**

Kenneth Bolling brought this action against the City of Montgomery after he abruptly resigned from the Montgomery Fire Department (MFD). Bolling alleges that he was constructively discharged when his supervisor, Chief Miford Jordan, falsely told him that he was being terminated due to his arrest on domestic violence charges and that he would consequently lose his retirement benefits if he did not immediately resign that day prior to the pending termination. Bolling submitted his resignation that day, and because he resigned (as opposed to being terminated), he was not given a due process hearing—and contrary to what Chief Jordan allegedly told him—he lost certain benefits that he may have retained had he not immediately resigned. Further, Bolling alleges that after his resignation, he was denied payment for his accrued leave in breach of the City's rules and regulations.

1

Bolling filed this lawsuit against the City, claiming (1) a violation of his due process rights under the Fourteenth Amendment to the United States Constitution and Art. 1, §§ 13, 35 of the Alabama Constitution, and (2) a breach of contract under Alabama law. Bolling's other claims did not survive summary judgment.

At the request and consent of both parties, a bench trial was conducted in this case on May 16–17, 2022 and July 11, 2022 to determine whether Bolling was constructively discharged. The parties acknowledge that if Bolling was constructively discharged, the City should have afforded Bolling due process proceedings. The parties also acknowledge that if Bolling was not constructively discharged—that is, he voluntarily resigned—then the City complied with all constitutional and contractual requirements related to Bolling's separation from the MFD.

After receiving testimony, evidence, and argument from both parties, and after making the following findings of fact and conclusions of law as required by Fed. R. Civ. P 52, the Court finds in favor of the City on both of Bolling's remaining claims.

## I.   BACKGROUND

Bolling worked for the MFD for thirty-three years. He started as a firefighter and worked his way up to Chief of Operations (CO). As CO, Bolling was the second in command in the MFD, only outranked by Chief Jordan. Due to

his position at the MFD, Bolling could not be fired without cause and without due process. If he was fired for cause, he still would be entitled to certain retirement benefits.

The events surrounding this case begin in the late hours of June 27, 2018. That night, Bolling visited his ex-girlfriend's house. There, he allegedly physically assaulted his ex-girlfriend and then left shortly thereafter. The police were called to the residence, and after finding probable cause for a crime of domestic violence, a warrant was issued for Bolling's arrest.

On the following morning (June 28), the Chief of Police for the Montgomery Police Department informed Chief Jordan that a warrant had been issued for Bolling's arrest. Chief Jordan then contacted Bolling and informed him about the warrant. Bolling turned himself into the city police that morning where he remained in jail the rest of the day under a 12-hour hold required in domestic violence cases. He was released late that evening or the following morning (June 29) in enough time to make it to his next shift at the MFD that morning.

That morning, Chief Jordan spoke with Bolling in the MFD parking garage as they were both reporting for duty. The two talked as they made their way to Chief of Staff John Petrey's office to discuss next steps related to Bolling's arrest. At this point, the facts relevant to the disposition of this lawsuit become heavily contested and diametrically opposed.

According to Chief Jordan, in the parking garage and on the way to Petrey's office, Bolling kept repeating that he should not have gone over to his ex-girlfriend's house. Chief Jordan also testified that the two did not talk about anything related to Bolling's employment status at the time.

According to Bolling, the discussion was somewhat different. Per Bolling, Chief Jordan approached Bolling in the parking lot, hugged him, and told him, "They [are] going to fire you."[1] Chief Jordan also said, "Bolling, I'm talking to you like a brother. . . . [T]here ain't no fighting this."

Chief Jordan and Bolling's testimony continued to differ as it concerned the meeting in Petrey's office. Chief Jordan testified that he and Petrey informed Bolling that he was being placed on administrative leave per order from higher-ranked City officials due to the arrest. Chief Jordan further testified that he never told Bolling that he was being terminated, that he should resign, or that he would lose his benefits if he did not resign. Simply put, according to Chief Jordan, they never discussed resignation or termination whatsoever during the meeting. This version of events was fully corroborated by Petrey, who reiterated in his testimony that Bolling was put on administrative leave without ever discussing resignation, retirement, or termination, and that Bolling acknowledged being put on administrative leave while an investigation into the arrest was conducted.

---

[1] Chief Jordan testified that Bolling's version is "absolutely" a lie.

4

Bolling's version of the office discussion is different.  According to Bolling, Chief Jordan continued to double-down on his previous assertions that Bolling was going to be terminated.  Specifically, Bolling testified that Chief Jordan told him: "Before I get back from my other meeting, to receive your letter of resignation, you could go across the street and sign your retirement papers, and that way they can't take it."

While their versions of what was discussed in the office differed, the series of events landed on the same final act—Bolling signed a form putting him on administrative leave with pay pending the outcome of the City's investigation into Bolling's arrest.  Chief Jordan and Petrey ended the meeting and went to another engagement.

Bolling testified that after the meeting, Bolling went directly to the retirement office at the City and filled out his resignation paperwork.  According to him, he resigned immediately because of the choice Chief Jordan had just given him—be terminated immediately and lose benefits or resign immediately and retain benefits.

Bolling obtained the paperwork from the retirement office and then promptly delivered that paperwork to Chief Jordan.  He signed and dated his resignation letter for that day, making his resignation effective immediately. Bolling testified that he turned in this resignation letter that day because Jordan and

Petrey had told him that he would only have that afternoon to resign and retire or else he would lose his benefits.

Because Bolling resigned,[2] he was not given a termination hearing. Additionally, because he resigned "effective immediately" without providing seven days' notice of his resignation, the City did not pay him for accrued leave and sick time, per the City's policies and regulations.

Having lost out on these benefits and later believing that he did not voluntarily resign but was constructively discharged, Bolling brought this action, which currently advances claims for constructive discharge (Count I) and breach of contract (Count III).

## II.  JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Bolling's federal cause of action, and the Court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

---

[2] From Bolling's standpoint, resignation ended any city investigation into the domestic violence incident over which criminal charges had been initiated and therefore Bolling would have avoided having to sit and answer questions during the interview about the incident as well as the other incidents, allegations, and convictions of domestic violence against Bolling over the years, and arguably would have allowed him to separate in good standing. During the trial, there was much testimony and evidence about other domestic violations incidents, criminal charges and convictions against Bolling. The Court fails to see the relevancy of his domestic violence history other than the impact it may have had in his decision to resign, effective immediately.

### III. STANDARD OF REVIEW

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). In a bench trial, "it is the exclusive province of the judge . . . to assess the credibility of witnesses and to assign weight to their testimony." *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993). Additionally, "[a] trial judge sitting without jury is entitled to great latitude concerning the admission or exclusion of evidence." *Wright v. Sw. Bank*, 554 F.2d 661, 663 (5th Cir. 1977).[3]

### IV. DISCUSSION

#### A. Findings of Fact

This case presents the quintessential he said/he said scenario, presenting the question as to whose version of events of June 28 and 29 are to be believed: Jordan and Petrey's version or Bolling's version. The Court must believe Bolling's testimony, Jordan and Petrey's testimony, or some mixture of the two. Recognizing this, the Court finds that Jordan and Petrey's testimony about their conversations with Bolling prior to and during the Petrey meeting on June 29 is more reliable and credible. Accordingly, the Court finds that neither Chief Jordan nor Petrey mentioned termination, resignation, or retirement whatsoever before and

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit.

during the office meeting with Bolling.  Rather, Chief Jordan and Petrey put Bolling on administrative leave and made sure Bolling understood this before concluding the meeting.

The Court credits Chief Jordan and Petrey's testimony for several reasons.  First, the testimony is two against one: Chief Jordan and Petrey's corroborated version against Bolling's standalone version of facts.  Second, both Chief Jordan and Petrey were credible witnesses on the stand.  Unlike Bolling, neither Chief Jordan or Petrey were inconsistent, shifting, evasive, unclear, or ambiguous in their testimony.

Third, Chief Jordan and Petrey's version of events is logical.  Chief Jordan and Petrey put Bolling on administrative leave, and Bolling admittedly signed a form acknowledging that he was being placed on administrative leave.  If Chief Jordan and Petrey were attempting to force Bolling to resign, then there would be no need to put Bolling on administrative leave in the first place.  And Bolling, armed with extensive knowledge about the employee discipline policies and process within the MFD, signed off on his administrative leave form.

Which leads to the fourth point: it defies credibility that Bolling, the CO and a pivotal official in the MFD employee disciplinary process, would believe Chief Jordan's claimed false assertion that Bolling needed to resign to preserve his

8

access to certain retirement benefits.[4]  Bolling as the CO would know that this was not possible under the MFD and City's policies and regulations.

And finally, and perhaps most persuasively, on the morning he turned himself into the city police—*before* his parking lot discussion with Chief Jordan and *before* the Petrey office meeting—Bolling called city retirement specialist Kim Neese to obtain an estimate of retirement benefit payouts should he decide to retire immediately.  This uncoerced, self-initiated action supports the inference that Bolling intended to resign (or at least was seriously considering it) prior to any discussion with Chief Jordan and Petrey about his termination and supposed loss of retirement benefits.

The Court therefore credits their testimony over Bolling's contradictory testimony.  As such, the Court makes the following findings of fact:

- Prior to his discussions with Chief Jordan and Petrey, Bolling was already contemplating an immediate retirement due to the domestic violence incident and his arrest, and he was taking affirmative actions toward that endeavor.

- During the parking lot discussion, Chief Jordan never mentioned termination, resignation, or retirement with Bolling.

---

[4] Kim Neese credibly testified that a firefighter who is terminated would not lose his or her retirement benefits if they were already eligible for benefits.

- During the meeting in Petrey's office, neither Chief Jordan nor Petrey mentioned termination, resignation, or retirement with Bolling.

- During the meeting in Petrey's office, Bolling was placed on administrative leave with pay pending the City's investigation into Bolling's arrest.

- On June 29, 2017, Bolling resigned "effective immediately" without providing seven days' notice of his resignation to the MFD.

- The MFD requires seven days' notice of resignation for an employee to qualify for payment for accrued leave and sick time.

**B. Conclusions of Law**

Based on the Court's findings of fact, the Court has two legal determinations to make: (1) was Bolling constructively discharged and therefore denied due process, and (2) did the City commit a breach of contract by denying his request for accrued leave pay?  The Court finds in favor of the City on both questions.

### i. Due Process[5]

In Count I, Bolling alleges that he was constructively discharged without due process—a violation of the Fourteenth Amendment. To establish a procedural due process violation, Bolling must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). The Fourteenth Amendment guarantees public employees due process when they are being terminated. *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1567–68 (11th Cir. 1995). Importantly, and at issue here, this due process right does not extend to public employees who voluntarily resign. *Id.*

"[R]esignations are presumed to be voluntary." *Id.* at 1568. That presumption can be overcome where (1) "the employer forces the resignation by coercion or duress" or (2) "the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Id.* This test requires an objective inquiry into the surrounding circumstances. *Id.* at 1568, 1570.

---

[5] Bolling alleges due process violations under both the Alabama Constitution and the United States Constitution. However, outside of citing to the Alabama Constitution, Bolling exclusively argues, cites, and advances his argument with authority only pertaining to the Fourteenth Amendment to the United States Constitution. Therefore, the Court finds that any argument advanced under the Alabama Constitution has been abandoned. But in any event, "'[t]he Alabama Supreme Court 'has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution,' so no separate analysis of [Bolling's] State constitutional claim is required." *Clark v. City of Montgomery*, 535 F. Supp. 3d 1197, 1212 (M.D. Ala. 2020) (quoting *Ex parte DBI, Inc.*, 23 So. 3d 635, 643 (Ala. 2009)).

When evaluating whether a resignation was forced through coercion or duress, the Court considers the following factors: (1) whether the employee was given an alternative to resignation, (2) whether the employee understood the alternative, (3) whether the employee had a reasonable time to decide, (4) whether the employee chose the effective date of the resignation, and (5) whether the employee had the advice of counsel. *Id.* at 1568. "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause, [unless] the employer actually lacked good cause to believe that grounds for the termination . . . existed." *Id.* "Under the misrepresentation theory, a court may find a resignation to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation." *Id.* at 1570 (internal citation omitted).

Bolling advances his constructive discharge claim under both coercion and misrepresentation theories. Bolling's claim, however, is rooted solely in his own version of the facts—particularly his version of his conversations with Chief Jordan and Petrey. Since the Court credits Chief Jordan and Petrey's testimony in its findings of fact over Bolling's version, both of Bolling's theories fail.

Chief Jordan and Petrey never mentioned termination, resignation, or retirement to Bolling in the hours before Bolling submitted his resignation. They never encouraged him in any way to take any particular employment-related

12

actions other than those implicit in placing an official on administrative leave with pay.  They made no misrepresentations of material fact, let alone any upon which Bolling, the CO and an employee well-versed in the MFD's personnel policies, relied in his decision to resign.[6]  Bolling's misrepresentation theory is unavailing and not supported in fact.

Similarly, neither Chief Jordan nor Petrey (nor any other city official) forced Bolling to resign through coercion or duress.  Rather, Chief Jordan and Petrey simply effectuated Bolling's administrative leave, and then that same day, Bolling voluntarily resigned, something that he already was contemplating before he spoke with Chief Jordan and Petrey.  Bolling was given an alternative to resignation—that is, administrative leave with pay pending the outcome of an internal investigation.  *See Hargray*, 57 F.3d at 1568 ("[When considering alternatives to resignation], the mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." (internal citation omitted)).  Additionally, the trial record based on the Court's findings of fact reveals that Bolling was placed under no time pressure for determining his next steps within

---

[6] Even if Chief Jordan had made the misrepresentation that Bolling asserts—that the City was trying to take his retirement from him unless he resigned—this would not suffice for a finding of misrepresentation, since Bolling had sufficient expertise in City policy and process to know that no MFD employee would face this choice under the City's personnel policies and regulations. His claimed reliance on this assertion, therefore, would not have been reasonable, precluding a

13

the MFD, Bolling chose the effective date of his resignation, and Bolling had the opportunity to seek the advice of counsel if desired. *See id.* Lastly, as the CO, Bolling reasonably understood his alternative to resignation—administrative leave. *See id.* Bolling has failed to show by a preponderance of the evidence that he was subjected to a constructive discharge under either a coercion or misrepresentation theory.

There being no constructive discharge, Bolling was not entitled to due process after he voluntarily resigned from the MFD, effective immediately. Accordingly, the Court finds in favor of the City as to Bolling's due process claim.

### ii.  Breach of Contract

Bolling also brings a breach of contract claim in Count III. Bolling alleges that the City breached its contract with him—that is, the City's personnel rules and regulations applicable to vested benefits—when it failed to pay him for his accrued annual leave and a portion of his accrued sick leave. Bolling roots this argument in his due process challenge—because Bolling was constructively discharged by the City, he should not be subject to the City's requirements for receiving leave benefits following a voluntary resignation. The City contends that it was not in breach when it denied Bolling's requests because Bolling did not provide seven

---

finding of constructive discharge based on a misrepresentation theory. *See Hargray,* 57 F.3d at 1570.

days' notice of his resignation as required by the City's personnel rules and regulations.

To prevail on its breach of contract claim under Alabama law, Bolling must establish the following elements against the City: "(1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020) (citations omitted).

Here, the plain language of the personnel rules and regulations allow the City to withhold the contested benefits if Bolling does not provide seven days' advance notice of his resignation. Because the Court has determined that Bolling was not constructively discharged when he resigned "effective immediately," the City did not breach its personnel rules and regulations when it did not pay Bolling for his accrued annual leave and sick leave. Rather, Bolling failed to perform pursuant to the plain language of the City's personnel rules and regulations—a key element to his claim—precluding a finding in his favor. Therefore, the Court also finds in favor of the City as to Bolling's breach of contract claim.

## V. CONCLUSION

Accordingly, the Court CONCLUDES and ORDERS as follows:

(1)  The City of Montgomery did not violate Kenneth Bolling's constitutional due process rights.

(2)     The City of Montgomery did not commit a breach of contract with Kenneth Bolling.

(3)     Judgment is hereby entered in favor of the Defendant City of Montgomery and against the Plaintiff Kenneth Bolling on Counts I and III.

(4)     Costs are taxed against the Plaintiff.

A Final Judgment will be entered separately in accordance with these findings.

DONE, this the 6th day of January, 2023.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE